Hearing Date: March 18, 2020 at 11:00 a.m. (ET)

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036-7203
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Brendan M. Scott

*Counsel to NYC NPL Servicing, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
In re                                                                  :
                                                                       :    Chapter 11
51 EAST 73RD ST LLC                                          :
                                                                       :    Case No. 20-10683 (SHL)
                                       Debtor.     :
-----------------------------------------------------------------x

**MOTION FOR ORDER PURSUANT TO (1) 11 U.S.C. § 1112(b) DISMISSING CASE, (2) 11 U.S.C. § 543(d) (a) EXCUSING RECEIVER FROM COMPLIANCE WITH SUBSECTIONS (A), (B) AND (C) OF § 543, AND (b) AUTHORIZING THE RECEIVER TO CONTINUE IN CUSTODY, POSSESSION AND CONTROL OF DEBTOR PROPERTY, (3) 11 U.S.C. § 362(D), GRANTING RELIEF FROM THE AUTOMATIC STAY, AND/OR (4) 11 U.S.C. §§ 361 AND 363(E) DIRECTING THE DEBTOR TO PROVIDE ADEQUATE PROTECTION**

NYC NPL Servicing LLC ("NYC NPL"), by its counsel, hereby files its motion ("Motion") seeking an order (1) pursuant to 11 U.S.C. § 1112 dismissing the case, (2) pursuant to 11 U.S.C. § 543(d), (i) excusing Bruce Lederman, in his capacity as court appointed receiver (the "Receiver") of the real property known as 51-53 East 73rd Street, New York, NY 10021 (Block: 1388, Lot: 30) (the "Premises"), which is presently owned by 51 East 73rd St LLC (the "Debtor"), from compliance with subsections (a), (b) and (c) of Section 543 of the Bankruptcy Code, and (ii) authorizing the Receiver to continue in custody, possession and control of the Premises, (3) pursuant to 11 U.S.C. § 362(d) granting relief from the automatic stay, and/or (4)

pursuant to 11 U.S.C. §§ 361 and 363(e) directing the Debtor to pay monthly adequate protection payments to NYC NPL, and respectfully states as follows:

**PRELIMINARY STATEMENT**

The sole purpose of the Debtor's filing was to frustrate NYC NPL's legitimate efforts to enforce its rights by impeding a foreclosure sale scheduled to proceed the day after the Debtor commenced this case. There is no bankruptcy purpose to this case. The Debtor has no income and is significantly underwater on its mortgage obligations. It has no ability to reorganize its business because it has no equity in its only asset, the Premises. Under such circumstances, this case was commenced in bad faith.

The Debtor's obligations to NYC NPL arise from a loan made to the Debtor, which was secured by a mortgage on the Premises. After the Debtor defaulted, NYC NPL's predecessor in interest commenced a foreclosure action that resulted in the entry of an order appointing a receiver and ultimately in entry of a judgment against the Debtor in the amount of more than $24 million. The Debtor and its manager, Monique Ender Silberman, willfully refused to comply with the requirements of the Receivership Orders (as defined below), and the State Court found the Debtor, Simone Ender and Monique Ender Silberman to be in civil contempt as a result of their willful refusal to turn over rent and documents to the Receiver, their refusal to refrain from collecting rents, and their failure to refrain from renting out apartments in the Premises, among other things. The case was commenced in bad faith to prevent NYC NPL from enforcing its rights as a secured creditor. Consequently, the case should be dismissed.

If the Court determines that dismissal of the case is not appropriate, it would be in the best interests of the Debtor's creditors if the Court entered an order pursuant to 11 U.S.C. § 543(d) excusing the Receiver from turning over the Premises to the Debtor and authorizing the

Receiver to remain in possession and control of the Premises. There is little doubt that the best and highest use of the Premises would be to sell it vacant of all tenancies. The Premises is unique in that it can be renovated as a single-family residence, substantially increasing its market value. Yet, the Debtor and its alleged manager have engaged in a continuous campaign to frustrate the Receiver's efforts to maintain the Premises vacant of illegal occupants. The Debtor or its representatives have on numerous occasions changed the Receiver's locks at the Premises, have advertised apartments in the Premises to be available for illegal short term occupancies, and have allowed unauthorized persons to illegally occupy apartments in the Premises without the Receiver's knowledge or consent, and without turning over any rent to the Receiver.

The Debtor and its alleged manager have repeatedly demonstrated their willingness to ignore their obligations to the Debtor's creditors and numerous orders of the State Court mandating that they cease interfering with the Receiver's performance of his duties. As a result, the Receiver has spent considerable time and financial resources trying to remediate the damages caused by the failure to turn over rents and persistent efforts to illegally rent apartments in the Premises after the Receiver's appointment, and even after the State Court directed the Debtor to stop doing so. Indeed, the Receiver was forced to move for and obtained an order of the State Court holding the Debtor, its manager and several illegal occupants in the Premises in civil contempt. Among other things, the State Court's contempt order directed the Debtor and its manager to turnover to the Receiver all rents they had collected and directed the New York Police Department, the Sheriff or the Marshal to assist the Receiver in removing the illegal occupants that the Debtor allowed into the Premises. To date, however, the Debtor has not turned over any rent to the Receiver, and has thereby frustrated and impeded NYC NPL's rights and remedies.

The Debtor and its alleged manager have consistently put the interests of the Debtor's members ahead of the interests of its creditors and there is little doubt that it will continue to do so during the pendency of this case. It would be in the best interest of the Debtor and its creditors for the Receiver to remain in possession of the Premises to prevent the Debtor from allowing tenants to occupy the Premises and thereby frustrate the ability of the Debtor's estate or its creditors' ability to sell the Premises for its highest value.

Alternatively, NYC NPL is entitled to relief from the automatic stay under 11 U.S.C. § 362(d). The Debtor has no equity in the Premises and no legitimate chance of reorganization. NYC NPL already holds a judgment against the Debtor in the amount of no less than $24,353,114.61, with interest at the note rate from November 19, 2019 until entry of the judgment, and thereafter at the legal rate, costs and disbursements of the State Court Action, Referee's and advertising (publications fees), together with any advances which NYC NPL made for taxes, insurance, and interest and emergency maintenance of the Premises. As such, priority and general unsecured creditors have no hope of ever seeing a distribution in this case. It is obvious that the case was commenced solely as a last-minute ploy by the Debtor to stall the sale of the Premises at auction. There can be no hope of reorganization where secured claims exceed the value of the Debtor's only valuable asset, and the Debtor currently has no cash on hand to fund a chapter 11 plan.

The Debtor is already unable to pay post-petition debts as they become due, including, but not limited to, real estate taxes, utility bills, insurance premiums, professional fees and mortgage interest payments. Moreover, there is no financial strategy that could possibly provide the Debtor with an opportunity to effectively reorganize its affairs. The Debtor's proposed strategy to lease the apartments through short term rentals is illegal and would subject the Debtor

to significant fines from New York City. This is a textbook case of a Debtor, with no ability to reorganize, attempting to game the system by using the automatic stay as a means to frustrate a secured creditor's legitimate attempt to foreclose upon its lien. As the senior secured creditor in this case, NYC NPL is entitled to relief from the automatic stay to complete the auction that was scheduled to proceed shortly after the Debtor commenced this case.

Finally, if the Court determines to allow this case to proceed, and the Debtor is permitted to use NYC NPL's collateral, NYC NPL, as a secured creditor with a liquidated secured claim, is entitled to receive adequate protection payments.

## **BACKGROUND**

1. On December 16, 2016, the Debtor executed, acknowledged and delivered to CREIF 113 LLC ("Initial Lender") an Amended and Restated Promissory Note (the "Note") in the principal sum of $15,250,000, which was guaranteed by Simone Ender. As security for the Debtor's repayment of the Note, the Debtor delivered to the Initial Lender an Agreement of Consolidation, Extension and Modification of Mortgage, dated as of December 16, 2016 (the "Mortgage"), whereby the Debtor mortgaged to the Initial Lender the Premises, together with all buildings and appurtenances thereto, all rental income and all fixtures and articles of personal property annexed to or used in connection with the Premises.

2. The Debtor absolutely, unconditionally and irrevocably assigned all leases and rents to the Initial Lender (the "Assignment of Leases and Rents", and together with the Note and Mortgage, the "Loan Documents"). A copy of the Assignment of Leases and Rents is annexed to the Declaration of Tracy L. Klestadt ("Klestadt Declaration") as **Exhibit "A"**. On or about December 16, 2016, the Initial Lender assigned the Note and Mortgage to CREIF (LENDER) LLC. The assignment was properly recorded. On or about September 18, 2017, CRIEF

(LENDER) LLC assigned the Mortgage and the Note to the Initial Lender.  The assignment was properly recorded.  On or about September 18, 2017 the Initial Lender assigned the Note, the Mortgage and the Assignment of Leases and Rents (collectively, the "Loan Documents") to 73rd Park LLC.  The assignment was properly recorded.

3. The Debtor defaulted under the Loan Documents by failing to pay (i) a late charge due for untimely July 2017 monthly interest payments, and (ii) the August 2017 monthly interest payment.  As a result of the Debtor's default, 73RD Park LLC commenced a foreclosure action (the "Foreclosure Action") against the Debtor, among others, in the Supreme Court of the State of New York, New York County (the "State Court").

4. On July 17, 2018, the Hon. Judith McMahon, J.S.C. appointed John G. Hall as Receiver of the Premises in the Foreclosure Action, and directed him, among other things, to "demand, collect and receive from the occupants, tenants and licensees in possession of said premises, …, all the rents and license fees thereof now due or unpaid or hereafter to become fixed or due...", and to take charge and enter into possession of the Premises.  Thereafter, by Order dated November 5, 2018, Bruce N. Lederman was appointed Receiver in place of John G. Hall.  A copy of the November 5, 2018 and the July 17, 2018 Orders ("collectively, the "Receiver Orders") are annexed to the Klestadt Declaration as **Exhibit "B".**

5. The Receiver Orders directed the Debtor, occupants, and tenants, among others, and their agents, officers and the like to attorn to the Receiver all rents, license fees and other charges then due or thereafter due, and directed the Receiver to institute and carry on all legal proceedings for the collection of use and occupancy monies and rents then due or thereafter to become due, and commence summary or other proceedings for the removal of any tenant or tenants or other persons therefrom.

6. In August 2018, 73RD Park LLC filed a motion seeking entry of summary judgment in its favor, and on May 16, 2019, the State Court entered an order granting summary judgment and appointing a referee to compute the amount due to 73rd Park LLC.

7. On May 16, 2019, the Honorable Arlene Bluth of the Supreme Court of the State of New York, New York County (the "State Court") entered an order granting summary judgment against the Debtor and Simone Ender, and appointing Bruno F. Codispoti, Esq., as Referee (the "Referee"). A copy of the summary judgment order is annexed to the Klestadt Declaration as **Exhibit "C"**.

8. On June 12, 2019, 73RD Park LLC assigned all of its right title and interests in the Loan Documents to NYC NPL. A copy of the assignment documents is collectively annexed to the Klestadt Declaration as **Exhibit "D"**. On application of NYC NPL, NYC NPL was substituted as plaintiff in the Foreclosure Action.

9. On November 25, 2019, the Referee issued his Report of Amount Due. A copy of the Referee's Report is annexed to the Klestadt Declaration as **Exhibit "G"**.

10. The Debtor never complied with the directives in the Receiver Orders. It outright refused to turn over any rents collected from the tenants who occupied the Premises at the time of the Receiver's appointment. More egregiously, subsequent to the Receiver's appointment, and in willful and contumacious disregard of the Receiver Orders, the Debtor engaged in a blatant fraud on the Receiver and the State Court by advertising apartments in the Premises as being available for illegal short-term occupancy, then illegally rented apartments and absconded with all rents it collected from the short term occupants. Upon discovering the Debtor's fraudulent scheme, the Receiver filed an emergency motion in the State Court seeking an order of contempt.

11. On December 12, 2019, the State Court entered an order finding the Debtor, Simone Ender and Monique Ender Silberman in civil contempt of the State Court (the "Contempt Order") by reason of:

    a. their failure to turn over to the Receiver within five (5) days after the Receiver becomes qualified any deposits or advances of rental as security under any lease or license agreement affecting space in the premises affected by this action;

    b. their failure to turn over to the Receiver all rent lists, orders, unexpired and expired leases. agreements, correspondence, notices and registration statements relating to rental spaces or facilities in the premises;

    c. their failure to turn over to the Receiver all rents collected from and after the date of July 17, 2018;

    d. their failure to refrain from collecting the rents, license fees and other charges of said premises after July 17, 2018, and

    e. their failure to refrain from renting out apartment units in the subject Premises after July 17, 2018.

    f. their failure to turn over keys and documents requested by the Receiver by March 15, 2019.

A copy of the Contempt Order is annexed to the Klestadt Declaration as **Exhibit "E"**.

12. The Contempt Order also found certain illegal occupants of the Premises to be in civil contempt and directed that they deliver possession of the apartments they were illegally occupying to the Receiver. After significant cost and effort, and with the assistance of the New York Police Department, the Receiver was ultimately able to take possession of the illegally occupied apartments, despite the Debtor's and the occupant's efforts at all relevant times to thwart the directives of the State Court, and the Premises is now vacant.

13. On January 2, 2020, the State Court entered a judgement of foreclosure and sale (the "Foreclosure Judgment") in favor of NYC NPL, as assignee of 73rd Park LLC, against the Debtor and Simone Ender, among others. A copy of the Foreclosure Judgment is annexed to the Klestadt Declaration as **Exhibit "F"**. The Foreclosure Judgement, which confirmed the Referee Report, provided, in part, that the Premises was to be sold at auction under the direction of Bruno F. Codispoti, Esq., in his capacity as Referee. The Foreclosure Judgment directed that the Referee

pay to NYC NPL, from the proceeds of sale, $24,353,114.61 with interest at the note rate from November 19, 2019 until entry of the judgment, and thereafter at the legal rate, costs and disbursements as taxed, publication and advertising fees, together with any advances which NYC NPL made subsequent to the Judgment in connection with the maintenance of the Premises.

14. The Referee provided proper notice that the foreclosure sale was scheduled to occur on March 4, 2020, but on March 3, 2020, the Debtor commenced this case in an effort to delay the sale.

## **RELIEF REQUESTED**

15. By this Motion, NYC NPL requests that the Court enter an order, (1) pursuant to Section 1112 of the Bankruptcy Code dismissing the case, or alternatively, (2) pursuant to Section 543(d) of the Bankruptcy Code, (i) excusing the Receiver's compliance with subsections (a), (b) and (ii) of Section 543, (B) and authorizing him to continue in custody, possession and control of the Premises, or alternatively, (3) pursuant to Section 362(d) of the Bankruptcy Code granting relief from the automatic stay to allow NYC NPL to proceeds with the foreclosure sale of the Premises, or alternatively, (4) pursuant to Section 361 of the Bankruptcy Code directing the Debtor to pay monthly adequate protection payments to NYC NPL, and (5) granting such other relief as the Court deems appropriate.

### I. **The Case Should be Dismissed as a Result of the Debtor's Bad Faith Filing**

16. 11 U.S.C. § 1112, which governs the dismissal of a chapter 11 case, provides in part that "after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause." It is well settled that bad faith constitutes "cause" for dismissal. A

bankruptcy court may dismiss a bad faith filing on an interested party's motion or *sua sponte*. *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997).

17. "Bad faith exists where the debtor lacks any realistic possibility of reorganization, and files the petition for the sole purpose of frustrating and delaying its secured creditor's efforts to enforce its legitimate rights." *In re Spectee Grp., Inc.*, 185 B.R. 146, 155–56 (Bankr. S.D.N.Y. 1995)(citing *In re Beswick,* 98 B.R. 900, 903 (Bankr.N.D.Ill.1989); *In re Asbridge,* 61 B.R. at 102; *cf. In re* \*156 *Cohoes Indus. Terminal, Inc.,* 931 F.2d 222, 227 (2d Cir.1991) (a chapter 11 filing is frivolous under Rule 9011 "if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings."). In *In re C-TC 9th Ave. P'ship*, the Second Circuit identified eight factors that are indicative of a bad faith filing:

1) the debtor has only one asset;

2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

4) the debtor's financial condition is, in essence, a two-party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

6) the debtor has little or no cash flow;

7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

8) the debtor has no employees.

<u>In re C-TC 9th Ave. P'ship</u>, 113 F.3d 1304, 1311 (2d Cir. 1997).

18. Here, the Debtor's bad faith could not be more obvious. All eight of the *C-TC* bad faith indicators are indisputably present in this case:

1) The Debtor has only one asset, its ownership interest in the Premises;

2) The Debtor has few unsecured creditors, if any, and to the extent there are unsecured creditors, they will not benefit in any way from this case;

3) The Premises is the subject of the Foreclosure Action as a result of the Debtor's default on its debt owed to NYC NPL, and the State Court has already entered a judgment of foreclosure and sale;

4) The Debtor's financial condition is, in essence, a two-party dispute between the Debtor and NYC NPL, which can be, and until the filing of this case, was being resolved in the Foreclosure Action;

5) The Debtor timed its filing to occur just hours before a Foreclosure Sale was scheduled to proceed, with an obvious intent to delay or frustrate the legitimate efforts of NYC NPL with no real intent, or possibility of reorganizing;

6) The Debtor has absolutely no income;

7) The Debtor has no means to pay its expenses, including professional fees, US Trustee fees, real property taxes or insurance premiums.

8) The Debtor has no employees.

19. The Debtor's petition was filed with no hope of, and/or no ability to reorganize. The petition was filed just hours before the Foreclosure Sale was to proceed, as a last-ditch effort to stall the sale of a property with a mortgage that is underwater. In its Rule 1007 Declaration, the Debtor boldly alleges in conclusory fashion that it has a chance to reorganize but it sheds no light on how it will achieve a reorganization. It neither states that it has the ability to refinance nor that a sale of the Premises would result in sufficient proceeds to satisfy the more than $25 million debt owed to NYC NPL. As noted above, the Debtor has assigned all leases and rents to NYC NPL. Consequently, the Debtor cannot use rental income to fund the administrative costs of this case or

a bankruptcy plan because rents are not property of the estate. Simply stated, there is no legitimate bankruptcy purpose to this case and there is no ability to reorganize.

20. This is a classic bad faith filing used as a litigation tactic in a two-party dispute. *See In re Jean-Francois*, 516 B.R. 699, 705 (E.D.N.Y. 2014)(finding bad faith where (1) the debtor had an inability to effectuate a plan; (2) the debtor's financial condition was a two-party dispute between the debtor and secured creditor that could be resolved in the pending state foreclosure action; (3) the timing of the debtor's filing 20 minutes before a foreclosure sale evidenced an intent to frustrate the legitimate efforts of the debtor's secured creditor to enforce its rights; and (4) the debtor has little or no cash flow); *see also In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 336 (Bankr. S.D.N.Y. 2001)(granting relief from the stay for cause after finding of bad faith where the debtor has only one asset, real property. It had no employees. It produced no income, and had no discernible cash flow. It had very few unsecured creditors, and none, so far as the Court can determine, that would be helped by a chapter 11 reorganization. The real property was the subject of a foreclosure action as the result of arrearages on secured debts. The case was essentially a two-party dispute between the secured creditor and the debtor, and the timing of the Debtor's entry into bankruptcy caused the Court to find as a fact that the Debtor timed its bankruptcy filing so that it could avail itself of the automatic stay in order to stop the foreclosure action.)

21. In *Kaplan Breslaw*, the Court based its finding of bad faith as cause to lift the stay on the following finding:

- the case was filed for the predominant purpose, if not the sole purpose, of blocking measures by the secured creditor to foreclose on the real property, and in particular to utilize the automatic stay provided by section 362 of the Bankruptcy Code with respect to the real property to block the secured creditor's remedies;

- The debtor sought to exploit section 362's automatic stay not for a temporary "breathing spell," but, rather, as a means to maintain ownership

of the Warehouse without satisfying the debt associated with it, and to effect delay, and, if possible, a total blockage, of the secured creditor's remedies;

- The timing of the debtor's filings evidenced an intent to hinder, delay and/or frustrate the legitimate efforts of the secured creditor to enforce its rights; and

- There are no unsecured creditors who would benefit in any way from the debtor's filing, or who would be prejudiced as a result of relief from the stay.

*See In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309 (Bankr. S.D.N.Y. 2001).

22. The circumstances of this case are not substantially different from those in *In re Jean-Francois* and *In re Kaplan Breslaw Ash, LLC*. It is respectfully submitted that the Court should find the Debtor has acted in bad faith by commencing this case with no ability to reorganize.

**II. It is in the Best Interests of the Debtor's Creditors to Excuse the Receiver's Compliance with Section 543(a), (b) and (c) of the Bankruptcy Code and <u>Authorize Him to Continue in Possession of the Premises</u>.**

23. Section 543 of the Bankruptcy Code provides:

(a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

(b) A custodian shall—

(1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

(2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

(c) The court, after notice and a hearing, shall—

13

(1) protect all entities to which a custodian has become obligated with respect to such property or proceeds, product, offspring, rents, or profits of such property;

(2) provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian; and

(3) surcharge such custodian, other than an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition, for any improper or excessive disbursement, other than a disbursement that has been made in accordance with applicable law or that has been approved, after notice and a hearing, by a court of competent jurisdiction before the commencement of the case under this title.

(d) After notice and hearing, the bankruptcy court—

(1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property, and

(2) shall excuse compliance with subsections (a) and (b)(1) of this section if the custodian is an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition, unless compliance with such subsections is necessary to prevent fraud or injustice.

11 U.S.C. § 543.

24. A state court appointed receiver is a "custodian" for purposes of Section 543. 11 U.S.C. § 101(11)(defining custodian).

25. To date, Debtor's schedules have not yet been filed. Without seeing the schedules, it is hard to determine the purpose of this bankruptcy case. However, since the filings to date reflect that Debtor has no meaningful creditors **other than** NYC NPL, it seems clear that the sole purpose of the bankruptcy case was to frustrate NYC NPL's efforts to enforce its rights in the Foreclosure Action.

26. Section 543(d)(1) authorizes this Court to excuse the Receiver from turning over the Premises "if the interests of creditors…would be better served by permitting a custodian to continue in possession, custody, or control of such property." 11 U.S.C. § 543(d)(1); *see also*

House Report at 370 and Senate Report at 85 on the Bankruptcy Reform Act of 1978 (providing that Section 543(d) "…reinforces the general abstention policy in section 306 by permitting the Bankruptcy Court to authorize the custodianship to proceed notwithstanding this section."); *see also In re 400 Madison Ave. Ltd. Pshp.*, 213 B.R. 888, 895 (Bankr. S.D.N.Y. 1997).

27. A request under Section 543(d) is fact sensitive. *In re Uno Broadcasting Corp.*, 167 B.R. 189, 200 (Bankr. D. Ariz. 1994). "Courts consider factors including whether there will be sufficient income to fund a successful reorganization and whether there has been mismanagement by the debtor." *Id.* (citing *In re Dill*, 163 B.R. 221, 225 (E.D.N.Y. 1994)), *In re Constable Plaza Associates, L.P.*, 125 B.R. 98 (Bankr. S.D.N.Y. 1991). The interests of the debtor are not part of the criteria considered under 543(d). *In re Dill,* 163 B.R. at 225.

28. A review of the facts weighs in favor of granting this Motion. NYC NPL believes its interests would be better served with the Receiver administering the Premises as the State Court intended.

29. A chapter 11 proceeding under the facts of this case provides NYC NPL no benefit. Instead, it causes NYC NPL harm in that post-petition administrative expenses will be incurred and may be paid prior to NYC NPL being paid.

30. Under the facts specific to this Bankruptcy Case, NYC NPL and the Receiver have serious concerns that upon the turnover of the Premises to Debtor (if so required), the Debtor would continue to engage its year-long campaign of obfuscation, secretion and dissipation of assets. The limited funds the Receiver has in his possession would be back in the hands of this untrustworthy Debtor, that has brazenly ignored and refused to comply with numerous orders of the State Court.

31. Based upon Debtor's past conduct, there is an extremely legitimate concern that the funds will disappear and the Debtor would begin the process of once again allowing illegal and unauthorized tenancies in the Premises, which would frustrate the ability of the Debtor's estate to realize the highest value for the Premises, which is to sell it free of occupants.  Indeed, the Debtor has stated in its recently filed Application in Support of Request for Use of Cash Collateral and Turnover [ECF Docket No. 4] (the "Cash Collateral Motion") that if it regains possession of the Premises it intends to try to lease out apartments for short term rentals again.  Notably, New York State and New York City law prohibits the Debtor from allowing occupancies of less than 30 days in the Premises. *See NYS Multiple Dwelling Law Art. 1, § 4.8(a); see NYC Administrative Code § 27-2004(a)(8)(a)(i).*  The Debtor would be subjected to a fine of $1,000 for a first violation, $5,000 for a second violation, and $7,500 for three or more violations.  It is clear that the Receiver's maintenance and control of the Premises is in the best interest of the creditors of the estate.

32. Further, and again based upon the facts, it is in the best interest of NYC NPL, as the largest and possibly only creditor of Debtor's estate, that the Receiver be authorized and permitted to fulfill his obligations under the Receiver Orders.  A receiver left in possession by the bankruptcy court has no role in the bankruptcy case other than to manage and preserve the property in his charge in accordance with the orders governing his appointment.  *In re 440 Madison Avenue Limited Partnership*, 213 B.R. at 895.  The Debtor's creditors would be best served by allowing the Receiver to continue in possession and control of the Premises in order to preserve the value of the Premises.

### III. Alternatively, NYC NPL is Entitled to Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d).

33. 11 U.S.C. §362(d) provides, in part, that:

16

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

34. "The secured creditor who seeks relief from the automatic stay under § 362(d)(2) must demonstrate (1) the amount of its claim, (2) that its claim is secured by a valid, perfected lien in property of the estate, and (3) that the debtor lacks equity in the property." *In re Elmira Litho, Inc.*, 174 B.R. 892, 900–01 (Bankr. S.D.N.Y. 1994). "Once the movant establishes its prima facie case, the burden shifts to the debtor to show that the property is necessary for an effective reorganization." *Id.* For the Debtor to carry its burden, it must show "that the property is essential for an effective reorganization that is in prospect." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 376, 108 S. Ct. 626, 633, 98 L. Ed. 2d 740 (1988). The Debtor is required to demonstrate that there was the "reasonable possibility of a successful reorganization within a reasonable period of time." *Id*.

35. The Debtor has no equity in the Premises. The value of NYP NYC's secured claim exceeds $24 million, which exceeds the value of the Premises. In light of the fact that the Debtor has no equity in the Premises, the Debtor must show that the Premises is essential to an effective reorganization that is in prospect. *See Timbers*, 484 U.S. at 376, 108 S. Ct. at 633.

36. NYC NPL respectfully submits that such a showing is impossible. In addition to adequate assurance payments that will be due to NYC NPL, the Debtor must also pay, among other

things, its bankruptcy professionals, utility bills, insurance and real estate taxes. As set forth in the Debtor's Rule 1007 Affidavit, the Premises is currently vacant and provides the Debtor with no revenue. Additionally, the Debtor assigned all leases and rents in the Premises to its lender. As such, it cannot use rents it might collect to fund administrative costs or a plan because rents are not property of the estate. *See In re Soho 25 Retail, LLC*, No. ADV. 11-1286-SHL, 2011 WL 1333084, at *9 (Bankr. S.D.N.Y. Mar. 31, 2011)(finding that where the Debtor absolutely assigned rents to its lender such "rents are not property of the estate because the Debtor had, at most, a revocable license in the rents at issue—a license that was revoked by the Lender prior to the Petition Date—and because the Mortgage and the Note remain unsatisfied").

37. The Debtor has no cash and no means to pay for administrative costs of this case. This is an estate that was administratively insolvent from the day this case was commenced. The Debtor has no hope of reorganizing and it is incurring administrative expenses on a daily basis that it has no ability to pay. It appears that the Debtor's only goal is to delay the foreclosure without any regard or concern for the additional costs that this case will heap upon the Debtor.

38. The Debtor has no ability to pay the principal amount of the debt owed to NYC NPL and will have no ability to pay administrative expenses including professional fees, post-petition utility bills, insurance and post-petition real estate taxes once the Debtor is required to start making adequate protection payments to NYC NPL. Since the Debtor has no equity in the Premises and the value of NYC NPL's secured claim exceeds the value of the Premises, general unsecured creditors cannot expect to ever see a distribution in this case.

39. Based on the foregoing, the Debtor cannot establish that the Premises is essential to an effective reorganization. As such, NYC NPL is entitled to relief from the automatic stay to pursue foreclosure of its valid perfected lien.

## IV. If the Court Determines That is Will Not Dismiss the Case or Grant Relief from the Stay, NYC NPL is Entitled to Adequate Protection.

40. Sections 361(1) of the Bankruptcy Code entitle a secured creditor to adequate protection to the extent the automatic stay results in a decrease in the value of the underlying property. *See* 11 U.S.C. §361(1). Further, §363(e) prohibits a debtor's use of secured property without the payment of adequate protection to the secured party. *See* 11 U.S.C. §363(e).

41. The legislative history for Section 361 "makes clear that the purpose of providing adequate protection is to ensure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy." *In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004); *see also In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 405 (Bankr. S.D.N.Y. 2001) (the adequate protection required under §363(e) "is the performance for which [the creditor] has contracted").

42. The Debtor will more than likely argue that NYC NPL is adequately protected by the Debtor's equity in the Premises. However, the Debtor has not submitted an appraisal of the Premises and there is no other evidence that the value of the Property exceeds the amount of NYC NPL's claim. If this case is allowed to proceed, and the Debtor is authorized to use the Premises, which is indisputably NYC NPL's collateral, then NYC NPL is entitled to adequate protection payments. Pursuant to New York law, NYC NPL is entitled to statutory interest in the amount of 9% per annum on the full amount of the Judgment. For that reason, NYC NPL requests that the Court enter an order pursuant to §§ 361(1) and 363(e) of the Bankruptcy Code, requiring Debtor to pay NYC NPL adequate protection for the debtor's post-petition use of the Premises, monthly adequate protection payments equal to the monthly interest that is accruing at 9%.

## CONCLUSION

Based upon the foregoing, it is respectfully requested that the Motion be granted in all respects, and that the Court enter an order, (i) pursuant to Section 1112 of the Bankruptcy Code dismissing the case, or alternatively, (ii) pursuant to Section 543(d) of the Bankruptcy Code, excusing the Receiver's compliance with subsections (a), (b) and (c) of Section 543 in the best interest of creditors of the estate, and continue in custody, possession and control of the Receivership Funds, or alternatively, or alternatively, (iii) pursuant to Section 362(d) of the Bankruptcy Code granting relief from the automatic stay to allow NYC NPL to proceeds with the foreclosure sale of the Premises, or alternatively, (iv) pursuant to Section 361 of the Bankruptcy Code directing the Debtor to pay monthly adequate protection payments to NYC NPL, and (v) granting such other relief as the Court deems appropriate.

Date: March 12, 2020
      New York, New York

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP

By: */s/ Tracy L. Klestadt*
    Tracy L. Klestadt
    Brendan M. Scott
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000

*Counsel to NYC NPL Servicing, LLC*